In the Matter of the Estate of Bertha Bichl, Formerly Incompetent, Now Deceased.

Frank T. Platka, Jr., as Executor of the Estate of Bertha Bichl, Deceased, on Behalf of Children's Memorial Hospital of Chicago, Illinois, the Art Institute of Chicago, the Chicago National History Museum, the Illinois Industrial Home for the Blind, the Washingtonian Home of Chicago and the Supreme Lodge of the World Loyal Order of Moose, Petitioner for Citation, Appellant, v. Bernice Carone, Individually and as Conservator of the Estate of Bertha Bichl, Incompetent, Respondent to Citation, Appellee.

Gen. No. 49,971.

First District, Second Division.

November 2, 1965.

Ruddy & Myler, of Aurora (Charles J. Myler, of counsel), and Lee, Gieren & Phelan, of Chicago (William H. LeVitus, of counsel), for appellants.

Fleck & Pollack, of Chicago (Charles J. Fleck and William E. Pollack, of counsel), for appellee.

MR. JUSTICE LYONS delivered the opinion of the court.

This is an appeal from an order of dismissal, entered at the close of petitioner's evidence, in a citation proceeding brought pursuant to the Probate Act.

Petitioner, Frank T. Platka, Jr., testified that he was the attorney for Bertha Bichl and her deceased husband, Thomas Bichl, since 1929; that in 1943, he had purchased, with Thomas Bichl, a twenty-one apartment building in Chicago; that Thomas Bichl died in 1946; that in 1950,

the building needed repairs so Mrs. Bichl sold her share to him for $31,852; that the Bichls' original share had cost them $26,000; that at the time of this purchase from Mrs. Bichl, he executed a $20,000 first mortgage; that the remaining $11,850 was paid in cash; that in 1959 he contacted Mrs. Bichl to pay off the mortgage and subsequently, on July 27, 1959, went to the residence of Mrs. Bichl, then in her middle eighties; that Mrs. Bernice Carone, respondent, a niece of Mrs. Bichl, was present and when Mrs. Bichl could not find the mortgage at home, all three of them went to the Lincoln National Bank to seek the mortgage in Mrs. Bichl's safe deposit box; that the mortgage was not in the box, but there was in the box cash in excess of $19,000; that Mrs. Bichl indicated to him that she was sorry that the mortgage was being paid since she had used the $1,000 annual interest for her living expenses; that he asked Mrs. Bichl what she intended to do with the money and she asked for his suggestions; that he suggested to Mrs. Bichl that she take the money that was being paid and most of the cash in the box and purchase $30,000 in U. S. Government Bonds in her own name, place $5,000 in a savings account and leave the remaining funds in the box for emergencies; that Mrs. Bichl stated that this was what she would do but that it would be difficult for her to get to the box because she had trouble walking; that he asked if she could find someone; that Bernice Carone volunteered, stating that she saw Mrs. Bichl frequently and would take her to the safe deposit box; that Mrs. Bichl stated that she would arrange for Mrs. Carone to have access to the safe deposit box; that Mrs. Bichl was too feeble to sign her name on this occasion, but was able to inscribe an "x" to conclude the documentation necessary to give access to Mrs. Carone; that Mrs. Carone agreed to this arrangement; that they returned to the Bichl residence and Mrs. Bichl searched for and found the mortgage; that

Mrs. Bichl received checks covering principal and interest from Platka and the mortgage papers and note were marked paid.

In her testimony, Bernice Carone stated that on the day she accompanied Platka and Mrs. Bichl to the bank, July 27, 1959, she was made a joint tenant of the safe deposit box before the box was opened and that there was no discussion about making her a joint tenant.

Platka further testified that about two or three weeks after the July 27, 1959 visit to the bank, he received a call from Bernice Carone stating that Mrs. Bichl wanted her will and asking him to send it to Mrs. Bichl or Mrs. Carone; that he refused to do this and told Mrs. Carone that Mrs. Bichl should contact him or give him a letter authorizing him to deliver the will; that he received two or three subsequent calls in which Mrs. Carone insisted Mrs. Bichl wanted her will; that Mrs. Carone told him that Mrs. Bichl was in the Carone home and on one occasion he asked to speak with her on the telephone; that Mrs. Bichl was called to the phone and was asked if she wanted him to mail the will to her; and that Mrs. Bichl replied that she did not want the will and that he should keep it.

Platka further testified that in the latter part of September 1959, Mrs. Carone indicated to him that Mrs. Bichl was becoming incompetent and unable to manage her own affairs and inquired as to whether or not he should have a conservator appointed; that in mid-October 1959, he left Chicago for Florida. He also testified that on October 25 or 29, 1959, he received a telephone call in Florida from Bernice Carone and that Mrs. Carone told him that Mrs. Bichl still wanted her will, that it was becoming difficult for her to do anything with Mrs. Bichl and that $20,000 in U. S. Government Bonds had been purchased jointly in her name and Mrs. Bichl's name. He further testified he was no longer actively practicing law in Cook County and called John Phelan

7

of the firm of Lee, Gieren and Phelan, explained the situation and asked him to handle the entire matter.

According to Mrs. Carone's testimony, $20,000 in U. S. Government Savings Bonds were purchased at the bank on August 18, 1959, approximately three weeks after Mrs. Bichl, Frank Platka and herself had visited the bank; that the bonds were purchased with the $20,000 check which Mr. Platka gave to Mrs. Bichl to pay the mortgage; that she took Mrs. Bichl to the bank and was with her at all times when the bonds were purchased; that she also took Mrs. Bichl to the bank when the bonds were picked up; that the second purchase of bonds, in the amount of $10,000, was made again at the bank on March 26, 1960; that the $10,000 purchase money came from funds in the safe deposit box; that she again took Mrs. Bichl to the bank to purchase the bonds and remained with her at all times; that she subsequently obtained and paid two doctors to make examinations of Mrs. Bichl; that the first examination was on October 24, 1959, and the second was on October 25; that neither of the examinations were for the purpose of treating her; and that Mrs. Bichl did not request the examinations.

Mrs. Carone further testified that she called Frank Platka twice in September 1959, and requested that he send her the will; that she had discussed the will with Mrs. Bichl and was informed that it wasn't completed; and that Mrs. Bichl wanted it in her safe deposit box. Mrs. Carone then stated that she recalls Mr. Platka requesting to speak with Mrs. Bichl on the telephone while Mrs. Bichl was staying at the Carone residence with an infected foot; that Mrs. Bichl was awakened out of her sleep on that occasion and couldn't comprehend the conversation very well; that no conversation took place subsequently with either Platka or John Phelan regarding the need of a conservator for Mrs. Bichl; that after her visit with Platka and Mrs. Bichl at the bank on July 27, 1959, she had unlimited access to the safe

8

deposit box, which contained $19,000 in cash; that the cash was reduced to $9,000 after the second purchase of bonds in 1960; and that at the time the conservatorship was established for Mrs. Bichl, the box contained $6,500.

Mrs. Carone refreshed her memory after being shown nineteen entry slips to the box and recognized her signature on them. The slips were admitted into evidence and revealed the following dates and signatures:

1. July 27, 1959, signed by Bernice Carone.
2. August 14, 1959, signed by Bernice Carone.
3. August 18, 1959, signed by Bernice Carone.
4. September 4, 1959, signed by Bernice Carone.
5. September 5, 1959, signed by Bernice Carone.
6. October 6, 1959, signed by Bernice Carone.
7. March 26, 1960, signed by Bernice Carone and Bertha Bichl.
8. April 23, 1960, signed by Bernice Carone.
9. May 17, 1960, signed by Bernice Carone.
10. May 28, 1960, signed by Bernice Carone.
11. June 2, 1960, signed by Bernice Carone.
12. July 1, 1960, signed by Bernice Carone.
13. July 23, 1960, signed by Bernice Carone.
14. July 30, 1960, signed by Bernice Carone.
15. September 30, 1960, signed by Bernice Carone.
16. October 8, 1960, signed by Bernice Carone.
17. November 26, 1960, signed by Bernice Carone.
18. December 27, 1960, signed by Bernice Carone.
19. December 31, 1960, signed by Bernice Carone.

Mrs. Carone testified Mrs. Bichl would receive Social Security checks which she would endorse with an "x," take these checks to the bank, put the cash in the safe deposit box and pay Mrs. Bichl's bills, that she had the approval of Mr. Risel, a bank employee; that she was the only one who took Mrs. Bichl's Social Security checks to the bank, cashed them and paid Mrs. Bichl's bills; and that she kept an account of checks cashed and bills

9

paid and stated that she had turned these over to her lawyer. When petitioner asked that the records be produced, respondent's attorney objected on the ground that there was no burden upon her to keep records. The court sustained the objection and denied a request by petitioner's attorney to go into these records.

John J. Phelan, attorney for the executor, testified that Platka had retired from the practice of law and that he, Phelan, was handling matters for him; that in October 1959, he called Bernice Carone, who requested him to deliver to her the will of Mrs. Bichl; that she understood that Phelan had the will and would like it returned to her; that he subsequently called Mrs. Bichl at her own home in October or November 1959, and stated that he had her will and that if she would write him a letter he would return it to her; that Mrs. Bichl stated that she did not want the will returned; and that at one period in September and October 1959, he spoke to Mrs. Bichl on the telephone regularly for about ten days. The court sustained an objection to a question directed to him as to his opinion of the mental condition of Mrs. Bichl based on these conversations.

Phelan further testified that he advised Mrs. Carone that, having spoken with Mrs. Bichl, he did not think she could take care of herself. An objection was made to Phelan's testimony that Bernice Carone then replied to him that he should have nothing further to do with the case. The court sustained the objection and without motion ordered this testimony stricken from the record.

A motion was made by respondent's counsel at the close of petitioner's evidence that the proceeding against Bernice Carone be dismissed. Respondent's counsel reserved the right to present evidence if the motion were denied. The court granted the motion stating that a fiduciary relationship did not exist and directed that a final order be prepared. From that final judgment order petitioner has appealed.

Petitioner seeks recovery of the $30,000 in joint tenancy bonds upon the theory that a constructive trust existed in that there was a confidential and fiduciary relationship existing between Mrs. Bichl and respondent at the time the bonds were purchased; that petitioner did not have to show an abuse of the aforesaid confidential and fiduciary relationship because sufficient evidence was introduced to establish a prima facie case that the relationship existed; and that the burden of proof was then placed upon respondent to show that the purchase was not the result of undue influence.

Petitioner first contends that sufficient evidence was introduced to establish a prima facie case that such a relationship did exist and thus there was an abuse of discretion by the trial court in dismissing the citation proceeding upon motion of respondent at the close of petitioner's case, and second, that the court committed prejudicial error in refusing petitioner the right to examine respondent and certain documents and transactions pertaining to the handling of Mrs. Bichl's funds prior to the appointment of respondent as conservator.

■ ■ The general rule involved here was expressed by the Supreme Court in Kester v. Crilly, 405 Ill 425, 91 NE2d 419 (1950) at page 432:

> In general, in the law of constructive trusts, a confidential relationship exists in all cases when one person reposes trust and confidence in another who thereby gains a resulting influence and superiority over the first. (Krieg v. Felgner, 400 Ill 113; Brod v. Brod, 390 Ill 312). . . . The mere existence of a confidential relationship prohibits the dominant party from seeking any selfish benefit during the course of the relationship and affords a basis for fastening a constructive trust upon property so acquired. Where a confidential relation exists, the presumption obtains that the transaction complained of resulted from influence and superiority and the burden rests upon

11

the grantee to show that it was fair, equitable and just and did not proceed from undue influence. Schueler v. Blomstrand, 394 Ill 600; Brod v. Brod, 390 Ill 312.

The mode of operation of the presumption of undue influence and the transfer of burden of proof is set forth in the recent case of Tarpoff v. Karandjeff, 51 Ill App2d 454, 201 NE2d 549 (1964), where the court stated at page 457:

The mere existence of a confidential or fiduciary relationship does not, of itself, give rise to a constructive trust. The facts and circumstances must also disclose fraud or an abuse of that confidential or fiduciary relationship. Jones v. Washington, 412 Ill 436, 107 NE2d 672. The burden of proving the existence of such a confidential or fiduciary relationship and the abuse thereof rests squarely upon the party who asserts such a relationship as a basis for the imposition of a constructive trust. Maley v. Burns, 6 Ill2d 11, 126 NE2d 695. Where, however, the confidential or fiduciary relationship is shown to exist, the person seeking to impose a constructive trust is aided in his proof by a presumption that the transaction complained of resulted from fraud or undue influence and the burden of affirmatively proving the good faith or the absence of undue influence in the transaction rests upon the party denying the existence of the trust. Tarpoff v. Karandjeff, supra; McCartney v. McCartney, 8 Ill2d 494, 134 NE2d 789. To overcome this presumption, the fiduciary must show that he has made a free and frank disclosure of all of the relevant information which he had and that the consideration for the transaction was adequate. Schueler v. Blomstrand, 394 Ill 600, 69 NE2d 328; Masterson v. Wall, 365 Ill 102, 6 NE2d 161.

12

Our primary task is to examine the evidence with regard to the existence of a fiduciary relationship. The burden rested upon petitioner to prove by clear and convincing evidence a prima facie case of a confidential and fiduciary relationship. If successful, the burden would then shift to respondent. The Kester decision, supra, enunciates this principle along with some of the attributes of a confidential and fiduciary relationship. The court stated at page 432:

> The relationship may exist as a matter of law, as between principal and agent, guardian and ward, attorney and client, and the like, or it may be moral, social, domestic, or even personal. (Hensan v. Cooksey, 237 Ill 620; Irwin v. Sample, 213 Ill 160.) Where the relationship does not exist as a matter of law, it must, however, be proved by clear and convincing evidence in order to establish a basis for raising a constructive trust. (Clark v. Clark, 398 Ill 592; Galvin v. O'Neill, 393 Ill 475.) Factors to be taken into consideration are degree of kinship, if any, disparity in age, health, mental condition, education and business experience between the parties, and the extent to which the allegedly servient party entrusts the handling of his business and financial affairs to the other and reposes faith and confidence in him.

■ After a careful examination of the evidence introduced by petitioner together with the testimony of respondent, who was called as a court's witness, and a doctor who was called as a witness for respondent during petitioner's case, we feel the trial court's finding that the fiduciary relationship was not established was correct in part. The trial court could have found, and did find, from the evidence, that a fiduciary relationship did not exist on August 18, 1959, when $20,000 in bonds were purchased jointly in the names of Mrs. Bichl and

respondent. The parties were not living together and Mrs. Carone had only visited the box on one occasion prior to the first purchase of bonds. Any of the excluded evidence that Mrs. Carone was handling the financial affairs of Mrs. Bichl would be relevant only as to events after the $20,000 purchase of August 18, 1959.

 It is not necessary to respond to the issue of whether or not a fiduciary relationship existed when the second purchase of $10,000 in bonds took place because prejudicial error was committed by refusing to admit into evidence the admissions of respondent and testimony concerning the mental and physical condition of Mrs. Bichl. Prejudicial error was also committed when the trial court refused to allow petitioner to examine certain documents in the possession of respondent's attorney. The court, In re Estate of McVicker, 39 Ill App2d 389, 188 NE2d 731 (1963), discusses the rules of evidence in a citation proceeding. The court stated at page 397:

> It is true that in citation proceedings brought under section 183 of the Probate Act, wherein the representative of an estate brings the action against someone withholding assets claimed by the estate, the rules of evidence may be relaxed. Ill Rev Stats 1961, c 3, § 183. In such instances section 185 of the act provides that ". . . the court may examine the respondent . . . may determine all questions of title, claims of adverse title, and the right of property, and may enter such orders and judgment as the case requires." The cases interpreting section 185 hold that if the court determines that the testimony of the respondent is necessary for the full presentation of the facts, it may call him as a witness even though he otherwise would be incompetent under section 2 of the Evidence Act; that the respondent then becomes the court's witness and may be examined by either the court or the attorneys for the parties.

14

Respondent's Motion for Dismissal of the case was in effect a ruling for a directed finding that no confidential relationship existed and in ruling on such a Motion for Dismissal, the trial judge had to consider all the evidence in a light most favorable to petitioner. In excluding the proffered evidence the court committed prejudicial error as to the disputed gift of $10,000 in bonds.

We are not making a determination at this time whether or not petitioner's evidence was sufficient to establish a prima facie case as to the $10,000 in bonds purchased on March 26, 1960. We feel that this decision is to be made by the trial court after hearing all the evidence, including the interest of all parties.

The part of the order finding in favor of respondent, Bernice Carone, as to the gift of $20,000 in United States Savings Bonds, is affirmed and the part of the order finding in favor of respondent as to the disputed gift of $10,000 in U. S. Bonds is reversed, and the cause is remanded as to the dispute about the alleged gift of $10,000 in U. S. Savings Bonds, for further proceedings not inconsistent with this opinion.

Order affirmed in part, reversed in part and remanded for further proceedings.

BURKE, P. J. and BRYANT, J., concur.